Filed 7/22/25  Gu v. Anyride, Inc. CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CHAOLIANG GU, | H051694 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 20CV369050) |
| v. | |
| ANYRIDE, INC., et al., | |
| Defendants and Appellants. | |

A party's right to testify and present evidence is central to a fair hearing.  (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357.)  But the right is not absolute:  It is subject to " 'the responsibility to permit [the testimony] to be fairly tested.' "  (*In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 842 (*Swain*).)  If " 'a witness refuses to submit to cross-examination . . . , the conventional remedy is to exclude the witness's testimony on direct.' "  (*Ibid.*; see, e.g., *People v. Brooks* (2017) 3 Cal.5th 1, 30 (*Brooks*).)  And a trial court has inherent power " ' "to exercise reasonable control over all [its] proceedings . . . to insure the orderly administration of justice." ' "  (*Elkins*, at p. 1351.)  Although this inherent power " ' "should never . . . prevent a full and fair opportunity . . . to present all competent, relevant, and material evidence," ' " the " 'state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence.' "  (*Guardianship of A.H.* (2022) 83 Cal.App.5th 155, 160, 159 (*A.H.*).)

In this appeal, defendants Pierre (a.k.a. Peter) Moran[1] and AnyRide, Inc. argue that the trial court abused this inherent power in the jury trial on plaintiff Chaoliang "Colin" Gu's claims of fraud and defendants' cross-claims. As Gu's first witness, Moran had caused the court to repeatedly instruct, admonish, and temporarily eject him from the courtroom for his counsel to try to control his behavior, and caused two jurors to complain about his conduct. After Moran sought to remove the two jurors who complained, the trial court precluded Moran from testifying further. Defendants presented no evidence on either Gu's claims or their own cross-claims, and the jury awarded Gu more than $1.6 million in compensatory and punitive damages.

Defendants do not attempt to show actual prejudice and contend that ending his testimony was structural error. We affirm.

## I.  BACKGROUND

### A.  *Gu's Complaint*

Gu alleged that Moran fraudulently induced him to invest "labor and services, materials, supplies and money" to AnyRide, Moran's startup ridesharing company, in exchange for an ownership interest in the company. The fraud was accomplished through misrepresentations about (1) Moran's family, educational, and professional history, including his wealth and intent to self-fund the company if necessary; and (2) the business community's interest in the enterprise AnyRide was pursuing. Funding never materialized. Gu eventually discovered the falsity of Moran's representations and left AnyRide. In the operative complaint, Gu pleaded causes of action for (1) rescission of securities; (2) fraudulent sale of securities; (3) fraud by false representation and concealment; (4) negligent misrepresentation; (5) breach of fiduciary duty; and (6) unfair competition; (7) fraud by false promises without intention of performance; and (8) rescission and restitution based on fraud.

---

[1] Moran prefers Pierre to Peter, and the parties dispute which is his legal name.

**B.**    *Defendants' Cross-complaint*

Defendants cross-complained against Gu.  In the operative first amended cross-complaint, AnyRide asserted three causes of action against Gu:  (1) breach of a nondisclosure agreement (NDA); (2) misappropriation of trade secrets; and (3) intentional interference with prospective economic relations.  Moran asserted a cause of action for defamation.

Defendants alleged that Moran agreed to make Gu a cofounder and employ Gu at AnyRide "once it got off the ground and became . . . profitable" in exchange for Gu's financial contributions.  Gu signed an NDA to protect AnyRide's confidential information and a non-binding term sheet outlining his prospective position as a Chief Technical Officer with health benefits and stock options.  Moran was delayed in securing necessary additional funding because Gu failed to timely complete his work and "political factors and tariffs . . . caused [expected] investors to pull out."  Gu resigned one week before Moran obtained the first round of funding.  At about the time Gu resigned, Gu locked Moran out of AnyRide's confidential information, shared that confidential information with unidentified third parties, and posted it on social media.  Gu also made defamatory statements about Moran on social media and in comments to members of the business community.

**C.**    *The Trial Court's In Limine Ruling on Moran's Defamation Claim*

Gu moved to exclude evidence of his alleged defamatory statements, contending that Moran had failed to produce evidence that Gu made such statements to third parties.  Moran acknowledged that the three people to whom he believed Gu defamed him were not on Moran's witness list and that the statements Moran said Gu had made to those individuals were not the defamatory statements alleged in the cross-complaint.  The trial court deemed the unpleaded defamatory statements inadmissible.  Although the court did not bar Moran from questioning Gu about the statements Moran had alleged in the

cross-complaint, it added, "I don't see that there's a defamation cause of action" absent nonhearsay evidence Gu made the alleged statements to a third party.

**D.    *Moran's Pretrial Conduct***

In limine, Gu moved the court for an order precluding Moran from insulting counsel while testifying, citing several instances from Moran's deposition in which Moran had insulted counsel rather than answer counsel's questions. The trial court granted the motion without objection, to apply equally to Gu.

Two days later, Gu's counsel reported that Moran had engaged in witness intimidation by instructing the bailiff to arrest Gu's witness Alexander Irkhin. The trial court responded that it had not observed the alleged conduct and that any claims of criminal conduct should go to the District Attorney.

**E.    *Moran's Conduct Before the Jury and the Exclusion of Further Testimony***

As his first witness, Gu called Moran under Evidence Code section 776. Moran was on the stand for about three hours before the trial recessed for the day. During his testimony, he was variously disruptive, nonresponsive, and disrespectful to the court and counsel—despite repeated admonitions by the court and one brief ejection from the courtroom—prompting two jurors to separately raise concerns to the court at sidebar. The next day, after Moran's counsel moved to excuse these two jurors, the trial court barred Moran from testifying further—precluding not only further testimony in Gu's case but also any testimony on direct examination by his own counsel.

Even before questioning, Moran interrupted the trial court's efforts to address housekeeping matters with counsel by complaining in the jury's presence that there were four binders on the witness stand. Directed twice to stop, Moran eventually did. When the court began explaining the exhibit binders to Moran, he interrupted again to complain he did not know which of the four binders to look at. When the court reminded him that he had not yet been asked to look at any binder, Moran complained, "They're doing this on purpose." When the court demurred, Moran reiterated the accusation, adding, "Like

4

you are giving them too many chances." Told "to stop now," Moran said, "Okay," but turned his attention to someone in the courtroom, announcing, "He burglarized my house, that guy." The trial court told Moran to be quiet, but he persisted, "It's intimidation. Look at that guy." When the court again told Moran to be quiet, he persisted: "Hold me in contempt. Do whatever you want. That guy shouldn't be here." The court ordered Moran to leave the courtroom and instructed his counsel to talk to him. Before leaving, however, Moran continued to proclaim that "their witness" was "that guy" who "burglarized [Moran's] house." Moran added, "You guys are trash. Trash." (Moran's counsel later admitted that Moran's courtroom outburst included unreported expletives that counsel declined to repeat for the record.) Once Moran had left the room, the trial court apologized to the jury and instructed the jury to "disregard" Moran's outburst.[2]

After an unreported sidebar, Moran returned to the witness stand. When the trial court warned him that it expected no further outbursts in the courtroom, Moran said, "Yes ma'am. You got it."

Fewer than 10 questions into the examination, the trial court first struck as nonresponsive part of Moran's answer. Over the remaining time, the court instructed Moran to answer the questions asked, or reiterated counsel's questions to redirect a nonresponsive answer, more than 40 times. The court often repeated the questions for Moran as he persisted in arguing. By the end of the day the trial court struck Moran's nonresponsive commentary from about 20 answers.

Some questions Moran flatly refused to answer. Among the aspects of Moran's alleged fraud Gu's counsel previewed in his opening statement were lies about Moran's

---

[2] Moran would later contend that his outburst was provoked by the boyfriend of one of Gu's witnesses, whom the trial court had refused to exclude from the courtroom. The court rejected Moran's claim, noting that after denying Moran's request it had watched the boyfriend carefully and detected no provocation. When counsel later reiterated the claim of the boyfriend's provocation, the court described the argument as "gaslighting."

family—their wealth, assets, and employment—and a house Moran said he owned in San Francisco. But when asked if he owned a home in San Francisco, Moran responded, "I'm not going to disclose my family's personal affairs." Moran eventually testified that his family had a home in San Francisco. When repeatedly asked whose name it was in, Moran said, "You can carry me out of here, but I'm not going to -- you guys harassed my family for years now." Prodded by the court, Moran admitted that the house was not in his name but stood by his refusal to identify the alleged owner. Later, unprompted, Moran reiterated that he "wouldn't answer questions" about his family because "[t]hat guy burglarized my house six days before this happened."

And Moran's first outburst was not his last. His counsel agreed that Moran had multiple "outbursts," without disputing the trial court's description of those outbursts as "traumatic" for everyone present. From the cold transcript alone, twice after his initial outburst Moran again accused "[t]hat guy" of burglarizing his house.

The trial court had to instruct Moran to "stop" or be "quiet" about 30 times. These instructions came when Moran spoke out of turn, argued with counsel, cast aspersions on counsel and others, volunteered allegations of Gu's drug use and problems in Gu's marriage, criticized the court's rulings, interrupted the court, and openly laughed at the court. At least 10 times, Moran agreed to follow the trial court's instructions. But as the afternoon wore on, Moran was less willing to curb his behavior, arguing with and scoffing at the court's rulings and instructions.

Over the course of the afternoon, the trial court sent Moran outside the courtroom to speak with his counsel at least twice (counsel later acknowledged three such opportunities to control Moran's behavior). As counsel later admitted, she "could not get [Moran] under control."

After the jury was excused for the day, the trial court admonished Moran in anticipation of the next day: "Listen to the question and answer only the question," do

6

not display "anger," do not argue with the court or Gu's counsel, and do not "snicker[] on the stand." Asked if he understood, Moran said, "Yes" and "Yes, ma'am."

To start the next day's session, the defense moved to exclude two jurors who had expressed, in unreported sidebars, their discomfort and surprise, respectively, with Moran's behavior on the stand; the defense also renewed its motion to exclude the witness's boyfriend from the courtroom. Having reflected on Moran's conduct and rejecting defendants' assertion that the boyfriend had misbehaved, the trial court barred Moran from testifying further.

The trial court found that Moran "immediately had an outburst" on the stand and would not stop when admonished. And despite a pretrial admonishment to answer the questions he was asked he chose instead to "talk[] back to the [c]ourt" and "snicker[]," "[i]t didn't matter how many times [the court] admonished him." Although the trial court had enlisted Moran's counsel take him outside and get him under control, counsel failed.

The trial court also noted that one juror had told the court and counsel that it was "very stressful . . . to . . . take in [Moran's] anger and animosity" and another, separately, said he "was astonished" by the conduct of the trial. The court reporter and court staff had likewise reported being "stressed" by Moran's conduct.

After thinking "long and hard about the conduct," the trial court decided that it was "unfair that [Moran had] been so obstructive in this trial. [Moran had] refused to have adequate courtroom behavior no matter how [many times he was] admonished. . . . I need to put a stop to it." The trial court thought that Moran's conduct was inflicting "trauma" on the jury, and "the only thing we can do to make sure that the trauma stops is to not have him testify." Referring to Moran's conduct, "I've never had this happen in the 20 years that I've been on the bench."

The trial court also justified excluding Moran's further testimony on the grounds that "it's not fair that he can be so obstructive in [Gu's] case and then get on the stand

7

and presumably calmly give his side of the story" and that permitting Moran to continue would be "a mockery of this judicial system" and "a farce."

The trial court added that Moran's assertions from the stand that " '[h]e burglarized me' " were highly prejudicial because they would appear to the jury to be directed at Gu, not a person in the gallery. The trial court said that although Moran could remain in the courtroom for the rest of the trial, he would be excluded from the courtroom if he had any further outbursts.

Later that day, the defense moved for a mistrial, arguing that they could not put on a defense without Moran testifying. The trial court denied the motion.

After Gu rested his case the next day, the defense renewed the motion for a mistrial arguing that the trial court denied defendants their constitutional right to defend themselves by preventing Moran from testifying. The trial court made a record of several "false" statements and misstatements in Moran's written motion. The trial court reiterated that Moran "would have been allowed to" testify had he conducted himself appropriately. "But not while he's causing stress to everybody in the courtroom" and selectively being disruptive or calm according to which questions he wished to answer. Later, the trial court said that Moran's "refus[al] to answer the questions and to control his demeanor" was effectively denying Gu due process, and Moran's counsel replied that she "certainly [could not] deny that. [¶] . . . [¶] . . . That's true as well." The trial court clarified that Moran was precluded from testifying not only because he was upsetting everybody, but also because of "his conduct in not answering questions" which interfered with Gu's right to due process and Moran's refusal to modify his behavior after his counsel had "three opportunities to get him under control."

After the verdict, Moran filed a new trial motion. In the written order denying the motion, the trial court explained that Moran "deliberately refused to answer questions, said whatever he wanted and yelled at people in the audience." The court added,

8

"Excluding Moran from the witness stand was the only sanction that would remedy [Moran's misconduct] and protect [Gu's] right to a fair trial."

## F.     *Gu's Case*

### 1.     *Moran's Testimony*

Before his testimony was cut short, Moran testified that he met Gu when he interviewed with Gu's then-employer.  Although Moran never worked for Gu's employer, he and Gu were on friendly terms by September 2018 and had conversations about Moran's concept for AnyRide.

Moran told Gu that "depending on [Gu's] contributions and where we end up, [Gu could get] anywhere between five to 15 percent equity that would be vested."  But Moran "never guaranteed him anything."  Gu's equity was to vest "over four years with a one-year cliff" that Gu never satisfied.  Around October 2018, Gu signed a non-binding term sheet intended to formalize their understanding of how they might work together going forward.

Around October or November Gu began working for AnyRide.  During Gu's time with AnyRide, he and Moran split the company's expenses approximately evenly.  Moran said that he and Gu combined to put around $200,000 into AnyRide "[a]t a certain point." Moran could not recall producing any records to corroborate his claimed contributions.

AnyRide had difficulty securing funding because Gu "wasn't showing up to meetings."  Gu eventually resigned.

Moran denied ever having made any statement to Gu to induce him to join AnyRide.  But Moran agreed that he had told Gu about his experience at some other startups and admitted that he had not produced documents in the litigation to prove his success with past startups.  Moran could not recall whether he told Gu about receiving degrees from NYU and Harvard.  Moran maintained that he had attended both but admitted that he had produced no documents to prove that he graduated from either institution.

9

### 2. *Gu's Testimony*

Gu interviewed Moran in April 2018 when Moran applied to work for Gu's then-employer. Moran sent Gu a resume, which reflected that Moran had a computer and economic degree from NYU and an MBA from Harvard and past success leading specified startup companies.[3] In the interview process, Moran told Gu that he came from a wealthy French family and that he was well connected.[4]

In early September, Moran told Gu that he was in San Jose to make venture capital deals for SoftBank.[5] Moran used his time in the area to tell Gu about his idea for AnyRide. By the end of September, the two had verbally agreed that Gu would get 15 percent equity for his anticipated involvement in AnyRide. In October 2018, Gu quit his job to dedicate himself to AnyRide and signed a non-binding term sheet, which he at the time understood as a contract.

Gu understood he would take a pay cut and would have to invest his own money into AnyRide, but did so because of Moran's stated experience, connections, and wealth, including that Moran would self-fund AnyRide if necessary. Gu understood that his "capital contribution" would be reimbursed after AnyRide closed the first round of funding.

Gu spent almost a year working at and funding AnyRide. Gu wrote the software. Gu paid for a two-bedroom apartment that doubled as Moran's residence and a two-person office. Gu sent Moran money for claimed business expenses, paid for business expenses, and allowed Moran to make purchases using Gu's credit card and PayPal account.

---

[3] The resume was admitted into evidence. Moran testified that Gu generated or altered the resume for litigation.

[4] Moran testified that he never discussed his family with Gu.

[5] Moran testified that he never told Gu he had a position at Softbank.

10

Gu's financial contributions to AnyRide and Moran eventually emptied his personal savings account. But Moran never secured funding.

By August 2019, Gu had become sufficiently suspicious of Moran's use of Gu's money and failure to either secure funding or self-fund the business that Gu investigated Moran. Gu learned from Harvard that Moran had never attended. When questioned, Moran became aggressive.

Gu quit AnyRide in September 2019 after a prospective investor forwarded an e-mail in which Moran represented that AnyRide was a funded startup.[6] Because Gu did not believe AnyRide was funded, he concluded that Moran was trying to defraud the potential investor.

### 3. *Gu's Other Witnesses*

Gu's wife Wenxu Li corroborated Gu's testimony. In Li's presence Moran said he was from a rich French family, claimed to have a Harvard MBA and an engineering degree, described successful startup experience, and claimed to be so successful that he could elicit investments from large venture capital firms without an elevator pitch. At a dinner in late 2018, Moran said he and Gu were cofounders of AnyRide, Moran owned the majority of the company and Gu owned the rest. Moran claimed "on multiple occasions" to be "close to" securing funding for AnyRide, but never secured funding.

Gu's damages expert testified that Gu was able to document $232,316 in claimed out-of-pocket losses, whereas he claimed $4,294 in out-of-pocket losses without supporting receipts. And the expert testified that Gu lost earnings between $176,986 and $185,623 while working for AnyRide.

Gu called three witnesses who reported similar experiences with Moran.

Timothy Grubbs met Moran in Arizona in August 2014 and interacted with him until May 2015. Moran persuaded Grubbs to go start a business together, telling Grubbs

---

[6] Moran denied telling anyone that AnyRide was funded.

that he had past success with a startup, had a Harvard MBA, came from a wealthy French family, and himself owned multiple properties. Grubbs quit his job to focus on the new business and invested about $100,000. Around December, Moran was living in Grubbs's apartment and convinced Grubbs to co-found a business together, which they called Phenix Concepts. Grubbs had never co-founded a business before but understood that this meant he would need to put money into the business and Moran promised him an ownership interest in the company, with an understanding that Moran would pay him back. But Moran never paid Grubbs back. Grubbs left the business and ended his relationship with Moran after he came to believe that Moran had falsely told an investor that a $500,000 investment had been lined up.

Irina Berdnik met Moran in September 2019 and dated him for 14 months before they broke up in January 2021. Moran described his wealth to Berdnik, said he was from a wealthy French family, and said he began a computer science degree at NYU but transferred to Harvard to complete the degree while playing college football, later getting an MBA from Harvard. Moran showed Berdnik the AnyRide app, told her he had closed the first round of funding and expected to obtain more funding, and persuaded her to wire him a cumulative total of almost $200,000 to cover legal fees and payroll for AnyRide's growing staff of employees. He promised to repay her when the next round of funding closed, but he never paid her back.

To explain his failure to close, Moran told Berdnik that he had to fire "Colin," his brother-in-law and cofounder. Moran told Berdnik that Moran, Colin, and Moran's adopted sister "Wenxu" had gone to Harvard together and Colin had later married Wenxu.

Berdnik lost trust in Moran after Moran used her credit card to pay court fees in Arizona without asking in advance or supplying a plausible explanation. Berdnik searched online and could not identify a single AnyRide employee.

12

Irkhin met Moran in January 2021.  Moran described being from a wealthy French family, having a Harvard computer science degree, and having past success with startups.[7]  Moran persuaded Irkhin to leave his job to go into business together using the intellectual property from a project called AnyRide that Moran said he had purchased for $1.

## G.    *Defendants' Case*

After Gu rested, defendants did not call any witnesses on either Gu's complaint or defendants' cross-complaint.[8]  Defendants noted that they would have called Moran, but for the trial court's order prohibiting him from testifying.  Because the defense did not adduce evidence in support of the cross-complaint, the jury was not instructed on the defense counterclaims.

## H.    *Verdict, Punitive Damages, New Trial Motion, and Appeal*

Using a special verdict form, the jury found for Gu on the second (fraudulent sale of securities; by a unanimous vote), third (fraud; by a unanimous vote on the intentional misrepresentation theory and an 11-to-one vote on the concealment theory), sixth (unfair competition; by a unanimous vote), seventh (fraud by false promise; by a unanimous vote), and eighth (rescission and restitution based on fraud; by a unanimous vote) causes of action.[9]  The jury awarded Gu $185,623 for lost earnings (by a nine-to-three vote) and $232,316 for out-of-pocket losses (by an 11-to-one vote).

---

[7] In describing his wealth, Moran said that he formerly had a house in San Francisco and a Tesla but gave both to his ex-wife "Irina" in a divorce.  Berdnik testified that she had never been married to Moran and that he never gave her a house or a car.

[8] During cross-examination, defendants sought Gu's testimony relevant to Moran's defamation cross-claim.  The trial court sustained Gu's objection that the questioning was beyond the scope of the direct examination.  Defendants thereafter elected not to call Gu as a witness.

[9] Gu's first, fourth, and fifth causes of action for rescission, negligent misrepresentation, and breach of fiduciary duty were not presented to the jury.

During the punitive damages phase, Gu relied on Moran's representations putting Moran's net worth at about $100 million. This included discussion of the value of the house in San Francisco, an original Monet painting, stock from his brother who worked at Apple, Moran's claimed success in eventually funding AnyRide, and Moran's lavish spending.

In closing argument, Moran's counsel highlighted that the jury's liability finding depended on the determination "that the representations he was making were false" and that Gu was now relying on Moran's representations as evidence that Moran had enough money "to sustain a huge punitive damages award."

The jury awarded Gu $1.2 million in punitive damages.

The trial court entered judgment holding Moran and AnyRide jointly and severally liable to Gu for $1,735,032 including prejudgment interest, "with interest thereon at the rate of [10] percent . . . per annum from the date of entry of . . . judgment until paid." The judgment provided that defendants "shall take nothing by their" cross-complaint. Gu was awarded costs and attorney fees on both the complaint and cross-complaint, in an amount to be determined.

Defendants moved for a new trial based on the trial court's order terminating Moran's testimony. After the trial court denied the motion, defendants timely appealed from the judgment and the denial of the new trial motion.

## II.    DISCUSSION

Defendants' sole contention on appeal is that the trial court abused its discretion when it barred his further testimony, an error that defendants argue is reversible without any showing of prejudice. We conclude that the trial court did not abuse its discretion.

### A.    *Exclusion*

The trial court expressed two reasons for revoking Moran's right to testify, both of which are reviewed for abuse of discretion. First, exercising its inherent authority to control the litigation before it, the court terminated Moran's testimony finding that there

14

was no other way to stop him from his continuous misconduct. (See *A.H.*, *supra*, 83 Cal.App.5th at pp. 160–161 [explaining that when exercising inherent authority to dismiss a case as a sanction, trial court must consider both whether the pattern of conduct was so severe and deliberate that it is extreme and whether less severe alternatives to dismissal are available].) Second, the trial court reasoned that it would be unfair to allow Moran to testify on direct examination after he had frustrated Gu's de facto cross-examination. (See *People v. Price* (1991) 1 Cal.4th 324, 421 [holding trial court did not exceed its discretion when it concluded that expert's unwillingness to answer certain questions "would impair effective cross-examination to such an extent that the testimony should not be admitted"]; see also *Brooks*, *supra*, 3 Cal.5th at p. 30; *Swain*, *supra*, 21 Cal.App.5th at p. 842.) Focusing on the first rationale, we conclude that the trial court acted within its discretion when it ended Moran's testimony.

Defendants contend that the trial court's order terminating Moran's testimony cannot be justified as an exercise of the trial court's inherent authority for two reasons: (1) the trial court had not warned Moran that exclusion from the witness stand would be the sanction for further misconduct; and (2) the trial court did not first " 'explore[]' " and "impos[e]" less severe sanctions.[10] But we decline to adopt Moran's proposed requirements—the record supports the trial court's discretionary determination that the only way to stop Moran's extreme misconduct was to end his testimony.

---

[10] Defendants frame the trial court's order as a terminating sanction (as it relates to defendants' cross-complaint) for Moran's being "disruptive." Besides overstating the consequence when defendants remained free to call other, sometimes more logical witnesses, this argument understates the court's rationale, which the court repeatedly stressed was its determination that Moran's conduct would prevent Gu from having a fair trial if Moran were allowed to answer questions posed by his own counsel. Because the trial court's order raises legal issues that were not addressed in the briefing, we requested and obtained supplemental briefing from the parties.

15

The trial court considered alternative approaches to curb Moran's misconduct but decided that (1) Moran's continued pattern of conduct was so severe and deliberate that it was extreme; and (2) the only way to stop the conduct was ending his testimony. (See *A.H.*, *supra*, 83 Cal.App.5th at pp. 160–161 [explaining that when exercising inherent authority to dismiss a case as a sanction, trial court must consider both whether the pattern of conduct was so severe and deliberate that it is extreme and whether less severe alternatives to dismissal are available].)

While the sanction was severe, the misconduct was extreme and unremitting. The trial court gave Moran opportunity after opportunity to testify on de facto cross-examination, but Moran persisted in misconduct that his own trial counsel conceded deprived his opponent of a fair trial. Beyond the recalcitrance apparent from the bare transcript of Moran's testimony, the trial court noted Moran's "display of anger," the concerns of the two jurors, and defense counsel's repeated failures to dissuade Moran. This was no ordinary misconduct by a testifying witness; it was conduct that a seasoned trial judge described as "traumatic" for observers and "a mockery of th[e] judicial system."

Defendants cite no authority conditioning a trial court's discretion to exclude a party from testifying on the court's exhaustion of all lesser sanctions, or on express advance warning that exclusion from testifying is under consideration. The trial court here repeatedly instructed and admonished Moran and more than once ejected him from the courtroom. These sanctions were ineffective. Moran explicitly dared the court to find him in contempt and "carry [him] out of here." Even after his first ejection from the courtroom to talk to his lawyer, Moran continued to resist the court's efforts to enforce decorum: He was routinely nonresponsive in his answers, argued with the court, continued to accuse an unidentified person in the courtroom of burglary, laughed at the court and opposing counsel, and interjected commentary about his mind being "blown" by the unspecified misdeeds of the court and counsel. It was reasonable for the trial court

16

to conclude, as it did, that the "only thing [it could] do" to prevent his misconduct "is to not have him testify." Nothing in the record suggests that more explicit warnings or lesser sanctions would have abated Moran's misconduct on the stand.

Defendants argue that the trial court did not weigh any evidence "as to whether Moran's behavior on the witness stand would be, or could be, modified through other methods." We disagree. The trial court tried "other methods" to modify Moran's behavior. They failed. The failures no doubt informed the court's exercise of discretion.

Defendants suggest that we should disregard the trial court's determination that no other sanctions would stop Moran's misconduct because "the trial court did not expressly identify and address whether the other measures identified by [defendants in their postjudgment new trial motion] would or would not have deterred Moran and changed his behavior." But in its order denying the new trial motion the trial court wrote that "[t]here was no other possible sanction to vindicate the court's authority." So defendants' suggestion that the trial court needed to separately recite each potential lesser sanction asks us to presume that the trial court overlooked the arguments its order plainly addresses. We decline that invitation. (See, e.g., *Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 712.)

Defendants look to *A.H.*, *supra*, 83 Cal.App.5th 155. There, the maternal and paternal grandmothers of two children were in a custody dispute. (*A.H.*, at p. 158.) In ordering the parties to exchange witness lists, the trial court specified that failure to list a party as a witness would preclude the party from testifying. (*Id.* at pp. 158–159.) Due to counsel's neglect, one party failed to provide her witness list. (*Ibid.*) Because the offending party was to be her own only witness, the trial court ruled for the other party. (*Ibid.*) The reviewing court acknowledged that the trial court's exclusion of evidence and imposition of terminating sanctions are reviewed for abuse of discretion. (*Id.* at pp. 160–161.) The basis for reversal, however, was that the trial court abused its discretionary power by failing to exercise it at all, having through its pretrial order "announced, up

17

front, that it would not exercise any discretion." (*Id*. at p. 162.) The court also emphasized that (1) the party's attorney was the one at fault; (2) the attorney's mistake was not severe or extreme; (3) the prejudice to the other party was negligible because the other party was in custody of the grandchildren pending trial and a continuance could have been granted; and (4) lesser sanctions would have been adequate to vindicate the trial court's authority. (*Id*. at pp. 161–162.)

*A.H.* is distinguishable in every respect.

First, the trial court here made a considered discretionary decision to stop Moran from testifying after repeated attempts to curb his misconduct.

Second, we are not persuaded by defendants' arguments that the exclusion of Moran's testimony was a de facto terminating sanction. As it relates to Gu's claims, Gu bore the burden of proof and defendants had the opportunity to cross-examine Gu's witnesses. As it relates to defendants' cross-claims, the claims depended on Gu disclosing information to third parties. Although Moran had no viable witnesses other than himself on his witness list, he could have called Gu to question him about information Gu disclosed to third parties. Nothing in the record before us suggests that defendants could have proven any of their cross-claims through Moran alone.

Third, none of the other considerations in *A.H.* are present here. Moran, not his attorneys, was the one at fault. The trial court's determination that Moran's conduct was severe and extreme was reasonable. The trial court's determination that Moran's outbursts and evasiveness were prejudicial to Gu was reasonable. And the trial court's determination that lesser sanctions would not have vindicated the trial court's authority was eminently reasonable in view of Moran's intractable misconduct.

Defendants' suggestion that the trial court "barred [Moran] from testifying after he agreed to follow court orders" at the end of the day misreads the record. Because Moran consistently followed his intermittent "[y]es, ma'am" apologies with resumed

18

misconduct, the trial court was entitled to view his final bare acknowledgment of the court's expectations as unconvincing.

Moran's invocation of federal authority concerning the exclusion of a party from the courtroom is inapposite. (See *Kulas v. Flores* (9th Cir. 2001) 255 F.3d 780, 787 [upholding exclusion of a pro se plaintiff from courtroom during trial "until he could conduct himself more appropriately" because he "was warned that he would be removed if he continued to disrupt the proceedings and he manifested a clear intent to prevent defense counsel's cross-examination"]; *Badger v. Cardwell* (9th Cir. 1978) 587 F.2d 968, 970–971 [addressing removal of criminal defendant from courtroom during trial, which implicated the defendant's 6th Amend. rights under the confrontation clause].) The trial court never excluded Moran from the courtroom. The issue on appeal is his right to testify, not his right to be present.[11]

## B. *Prejudice*

Defendants have not argued that they were prejudiced by the trial court's exclusion of Moran's testimony. Instead, they argue that no showing is necessary because the claimed error is reversible per se. We disagree.

### 1. *Legal Principles*

"An appellant seeking reversal based on the erroneous exclusion of evidence ordinarily 'must show that a different result was probable if the evidence had been admitted.' " (*Kline v. Zimmer, Inc.* (2022) 79 Cal.App.5th 123, 134 (*Kline*).)

As an exception to this requirement, an appellant need not show prejudice "where the error is deemed 'structural.' . . . A structural error is one that 'affect[s] "the framework within which the trial proceeds, rather than simply an error in the trial process itself," thus affecting the entire conduct of the trial from beginning to end. [Citation.]

---

[11] We need not decide whether Moran's resistance to cross-examination was an independently sufficient basis to preclude him from testifying on direct examination.

19

Structural errors require per se reversal "because it cannot be fairly determined how a trial would have been resolved if the grave error had not occurred." ' [Citation.] The effects of such an error are not susceptible to measurement and therefore defy analysis by harmless error standards." (*Kline*, *supra*, 79 Cal.App.5th at p. 135.)

Denial of the *right* to offer admissible evidence on a material issue constitutes structural error. That is, " 'when a trial court erroneously denies *all* evidence relating to a claim, or *essential* expert testimony without which a claim cannot be proven, the error is reversible per se because it deprives the party offering the evidence of a fair hearing and of the opportunity to show actual prejudice.' " (*Kline*, *supra*, 79 Cal.App.5th at p. 136, quoting *Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1114 (*Gordon*).) But where there is only "[t]he erroneous denial of some but not all evidence relating to a claim [citations] . . . the appellant must show actual prejudice." (*Gordon*, at p. 1115.)

### 2.     *Defendants' Cross-claims*

Defendants contend that the trial court's exclusion of Moran's testimony is reversible per se because the court effectively denied all evidence relating to their cross-claims, precluding them from trying their cross-claims at all. Not so. Defendants had the opportunity to present evidence but made a tactical decision not to present a case.

Defendants are correct that Moran was the only viable witness they had listed.[12] But defendants could still have called Gu, as they represented they would—over Gu's fruitless objection—once the trial court ended Moran's testimony.[13] It was defendants'

---

[12] Defendants also listed a police officer who prepared a report of the alleged burglary at Moran's residence but take no issue with the trial court's observation that the police officer could not relate hearsay statements of others.

[13] After the trial court ended Moran's testimony defendants represented that they intended to call Gu in support of their claims, and the trial court overruled Gu's objection that he was not on the defense witness list. The next day, defendants twice revised their plan. First, they said that they might call Gu as a rebuttal witness on Gu's complaint but that they could not put on a case on their cross-claims if they could not call Moran. Then

choice to not call Gu, much as they chose not to identify any percipient witnesses other than Moran on their witness list. So the challenged ruling denied defendants the opportunity to put on their preferred witness but did not deny them the right to present other evidence supporting their claims. (See *Kline*, *supra*, 79 Cal.App.5th at p. 136.)

And defendants have not articulated how they could have proven any of their actual cross-claims using only Moran's testimony, where their cross-claims all turn on Gu's statements or disclosures to third parties. While Moran might be able to explain the impact, if any, of Gu's alleged wrongdoing on AnyRide or Moran, defendants have not shown how Moran could testify that Gu breached a nondisclosure agreement, disseminated trade secrets to third parties, or disparaged Moran or AnyRide to third parties without relying on hearsay statements made to him by third parties.[14]

Nor have defendants persuasively analogized Moran's anticipated testimony to essential expert testimony. (Cf. *Gordon*, *supra*, 170 Cal.App.4th at pp. 1110–1111, 1116; *Brown v. Colm* (1974) 11 Cal.3d 639, 647; *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 677 (*Kelly*).)[15] When a trial court precludes a plaintiff from

when Gu rested his case, defendants elected not to call any witnesses, saying that Moran was the only witness they would have called.

[14] At oral argument, defendants asserted for the first time that Moran's testimony alone could have established his entitlement to compensation for time he was unable to devote to strategic planning after Gu locked him out of various online accounts. Even if this theory had been preserved in defendants' briefing, however, it is not adequately grounded in defendants' cross-complaint: Although defendants alleged Moran's exclusion from AnyRide's GitHub and other accounts, it was Gu's alleged dissemination of confidential information therein and disparagement of Moran that was the gravamen of their claims, not Moran's lack of access.

[15] Defendants cite *Kelly* for the proposition that denying all evidence on a given claim makes the judgment on those claims per se reversible. It is true that *Kelly* declares, "Denying a party the right to testify or to offer evidence is reversible per se." (*Kelly*, *supra*, 49 Cal.App.4th at p. 677.) But neither the facts of *Kelly* nor the authorities it cites support defendants' broad a reading of *Kelly*'s negation of the disjunctive in the quoted

introducing expert testimony on an element that as a matter of law can only be established by expert opinion, it denies the plaintiff the opportunity to offer admissible evidence on a material issue. (See *Kline*, *supra*, 79 Cal.App.5th at pp. 135–136 [extending rule to exclusion of a defense expert].) But defendants have not shown Moran's testimony to be legally essential to defendants' actual cross-claims. Instead, what defendants rely on to characterize Moran as "essential" is their own election to forgo any other percipient witnesses. Having declined to argue actual prejudice, defendants do not articulate how Moran's testimony could have sufficed to sustain any of defendant's cross-claims.

### 3. *The Defense*

Defendants do not contend that the trial court's ruling precluded them from offering all evidence in defense against Gu's complaint. They concede that if we apply the "case law clinically, [defendants] would be required to show actual prejudice arising from their inability to call [Moran] to defend against Gu's claims." But defendants argue we should extend the law to protect them because it is difficult for them to show

---

passage. (See, e.g., *United States v. Palomares* (5th Cir. 2022) 52 F.4th 640, 653 (dis. opn. of Willett, J.) [explaining the logical precept that "the negation of a disjunction is equivalent to the conjunction of the negations"].) The crucial feature of *Kelly* was that the trial court's ruling there denied plaintiffs the right to present *any* evidence—both from plaintiffs themselves and from their expert—on their sole theory of liability. (*Kelly*, at p. 668 [characterizing the ruling as "effectively exclud[ing] any presentation of evidence on liability"].) The erroneous exclusion of evidence is ordinarily reviewed for prejudice. (*Gordon*, *supra*, 170 Cal.App.4th at p. 1115.) And this requirement of prejudice extends to the erroneous exclusion of party testimony, even where the party has a constitutional right to testify. (See *People v. Allen* (2008) 44 Cal.4th 843, 871 [analyzing for harmless error the denial of criminal defendant's right to testify in civil commitment proceedings]; see also *People v. Johnson* (1998) 62 Cal.App.4th 608, 636 [holding that erroneous denial of criminal defendant's right to testify was harmless beyond a reasonable doubt].)

prejudice without a record of what Moran would have said on the witness stand[16] and because the exclusion of Moran's testimony "gutted" the defense. We again interpret the record differently.

First, the record provides a basis to forecast what Moran would have said on friendly questioning from his own counsel. During adverse questioning, Moran denied making many of the representations Gu attributed to him, testified that some of the representations he made were true, testified that he made no promises or guarantees, and attributed AnyRide's failure to secure funding to Gu's shortcomings. The outlines of the defense narrative were presented to the jury before the trial court brought Moran's testimony to an early conclusion.

Second, the more salient question, in assessing prejudice in the case before us, is whether after his disastrous performance as an adverse witness Moran could have used additional time on the stand to tell his story more credibly, when at bottom his defense turned on the jury finding him more credible than Gu, his wife, and three apparently independent witnesses—despite Moran's inability to produce documents substantiating even the most basic of his claims about his educational credentials.[17] Defendants, having declined to argue prejudice, have not argued that there is a reasonable likelihood Moran could have achieved a more favorable result with more time on the stand. And we are not persuaded that a reasonable likelihood exists.

---

[16] Defendants made no offer of proof about Moran's anticipated testimony and maintain that an offer of proof would have been futile considering the trial court's rationale for excluding Moran's testimony. Even if defendants were not required to make an offer of proof to avoid forfeiture, their omission does not excuse them from showing prejudice as a condition for reversal.

[17] We cannot forecast what documents defendants might have been able to introduce through Moran, in large part because defendants omitted their exhibit list from the record on appeal. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 [discussing appellant's burden of providing an adequate record].) Regardless, Moran admitted on the stand that he had not produced evidence of a college degree in this litigation.

23

### III. DISPOSITION

The October 2, 2023 judgment and November 27, 2023 order denying defendants' motion for a new trial are affirmed. Gu is entitled to his costs on appeal.

_____

LIE, J.

WE CONCUR:

_____

DANNER, Acting P. J.

_____

BROMBERG, J.

*Gu v. AnyRide, Inc., et al.*
H051694